## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 07-40440

United States Court of Appeals
Fifth Circuit

**FILED**

January 14, 2015

Lyle W. Cayce
Clerk

VINE STREET LLC

Plaintiff - Appellee

v.

BORG WARNER CORP;

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before KING, JOLLY, and COSTA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal requires us to address the scope of so-called "arranger liability" under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607(a)(3), and the Texas Solid Waste Disposal Act ("TSWDA"), Tex. Health & Safety Code § 361.271(a)(3), in the light of the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. United States*, 556 U.S. 599 (2009). In 2006, some three years before the Supreme Court decided *Burlington Northern*, the district court held a bench trial and ruled that Borg Warner Corp. was liable to Vine Street LLC for 75% of the costs associated with

No. 07-40440

cleaning up a plume of perchloroethylene, or "PERC," that discharged from a dry cleaning business that operated from 1961 until 1975. The liability was associated with a former subsidiary of Borg Warner, Norge, which furnished dry cleaning equipment, design assistance, and an initial supply of PERC to the cleaning business.

On appeal, Borg Warner argues that it is not liable to Vine Street under either CERCLA or the TSWDA because Norge did not intend to dispose of PERC when it sold dry cleaning equipment and an initial supply of PERC to the cleaners. Vine Street, the current owner of the subject property, argues, however, that Borg Warner intentionally disposed of PERC into the ground because Norge knew that water separators designed to release wastewater, but not PERC, into the sewer were not completely effective. Additionally, Vine Street emphasizes that Norge, *i.e.*, Borg Warner, played a key role in designing the dry cleaning facility, including connecting the equipment to drains that emptied into a sewer, and urges us to conclude that Norge's role in the design supports a finding of intent. After a full review of the parties' arguments and the record, we agree with Borg Warner and REVERSE and VACATE the district court's judgment and REMAND for entry of judgment in favor of Borg Warner.

I.

The environmental damage at issue in this litigation stems from the operation of a dry cleaning business on a piece of property in Tyler, Texas, from 1961 until 1975. The business, called "College Cleaners," operated in collaboration with Norge, a former subsidiary of Borg Warner, to function as a "Norge Laundry & Cleaning Village" that offered customers self-service dry

No. 07-40440

cleaning.[1]  Norge sold six to eight dry cleaning machines to College Cleaners and provided an initial supply of PERC, the chemical used in the machines to clean the clothes.[2]  Additionally, Norge provided support to College Cleaners, assisting with the design of the building, installing machines in the building, testing the machines before the opening, and assisting customers with the operation of machines at the opening.  Particularly relevant to this appeal, the district court also determined that Norge designed the drainage system and connected the dry cleaning machines to the drains and sewer system.

As part of the drainage system, Norge equipped the dry cleaning machines with water separators that would release wastewater into the sewer and recycle PERC for future uses.  These water separators were not completely effective, however, and some PERC discharged into the sewer along with the wastewater through Norge's water separators.[3]  PERC was expensive, however, and both College Cleaners and Norge took steps to preserve as much PERC as possible.  College Cleaners employees handled the PERC with care to avoid unintended waste.  Several years after College Cleaners opened, Norge also modified the design of its water separators to reduce any loss of PERC through the separators.  From these facts, the district court concluded that

---

[1] Borg Warner sold Norge to a company called Fedders in 1968.  At the time it sold Norge, it purported to assign the liabilities associated with Norge's business to Fedders.  Borg Warner has raised the issue of contractual allocation of liability on appeal, but as we explain *infra*, we need not reach that issue in order to decide this appeal.

[2] It appears that Norge only provided the initial supply of PERC.  The cleaners received additional supplies of PERC from another company, and although Vine Street suggested in its brief that Borg Warner supplied its own PERC to the cleaners, there does not appear to be any evidence supporting this assertion in the record.

[3] Although there was some dispute in the district court as to the effectiveness of these separators, most of the PERC was recycled.  It appears from the record that the parties largely operated on the assumption that the water separators were generally at least 95% effective.

3

No. 07-40440

when the pollution occurred, "neither party intended to allow the discharge of PERC into the ground."

Some of College Cleaners' PERC ultimately escaped from the sewer system and entered the soil and groundwater, contaminating both the College Cleaners property and another neighboring property. Vine Street later acquired both pieces of property and learned of the PERC contamination. It applied to participate in the Texas Commission on Environmental Quality's voluntary cleanup program. To offset its costs, Vine Street filed suit against Borg Warner and a number of other defendants. The case against Borg Warner proceeded to a bench trial, and the district court held it responsible for 75% of the past, present, and future cleanup costs, along with a number of other expenses. Vine Street was responsible for the remainder.

Borg Warner filed a timely notice of appeal, but this case was stayed shortly after Borg Warner filed its initial brief because Fedders, another party to the action, declared bankruptcy. Fedders was subsequently dissolved in bankruptcy, and this appeal resumed after the conclusion of those proceedings.

II.

As this case proceeded to a bench trial, "this court reviews findings of fact for clear error and legal issues *de novo.*" *Delahoussaye v. Performance Energy Servs., L.L.C.*, 734 F.3d 389, 392 (5th Cir. 2013). Borg Warner has not challenged any of the district court's factual findings on appeal, and thus this appeal turns on whether those facts support the district court's legal conclusion, namely that Borg Warner is a responsible person for purposes of CERCLA and the TSWDA. We address each statute in turn.

A.

To establish CERCLA liability, the plaintiff must show:

(1) that the site in question is a "facility" as defined in [42 U.S.C.] § 9601(9); (2) that the defendant is a responsible person under [42

4

No. 07-40440

U.S.C.] § 9607(a); (3) that a release or a threatened release of a hazardous substance has occurred; and (4) that the release or threatened release has caused the plaintiff to incur response costs.

*Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir. 1989). The parties agree that the only dispute is whether Borg Warner is a "responsible person" under the second prong of the analysis.[4]

The category of responsible persons under CERCLA applicable here is the "arranger" category, which extends to

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or otherwise arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3). Borg Warner now concedes that its liability is co-extensive with Norge's, and thus our review focuses on Norge's actions. In order to resolve this appeal, we need only interpret the phrase "arranged for disposal . . . of hazardous substances." *Id.* We focus on the term "arrange," which implies a *scienter* requirement, and the term "disposal," which distinguishes between waste and useful products.

1.

a.

The Supreme Court recently clarified the standard applicable to CERCLA arranger claims in a case that bears a striking resemblance to the case before us. *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599 (2009). In *Burlington Northern*, an agricultural chemical distributor purchased several chemical products from Shell Oil Company. *Id.* at 602.

---

[4] Borg Warner does contest the amount of damages as an alternative argument on appeal. As we explain *infra*, we conclude that Borg Warner is not liable as an arranger, and thus we do not reach the issue as to damages.

No. 07-40440

Shell transported the chemicals to the distributor by common carrier, and they were transferred on arrival from tanker trucks into a storage tank. The distributor would then move the storage tanks around its property. *Id.* at 603–604. Leaks frequently occurred during each stage of these transfers, and, critically, Shell was *aware* of the frequent spills on the distributor's land. *Id.* Indeed, Shell developed additional protocols, including more detailed safety manuals and a discount program for distributors, to reduce spillage. *Id.* Despite Shell's efforts, the distributor's land became increasingly contaminated, and a number of parties to the cleanup sought to hold Shell liable as an arranger under § 9607(a)(3).

The Court in *Burlington Northern* first noted two hypotheticals at opposite ends of the arranger liability spectrum: (1) an entity is always liable under CERCLA if it enters into a transaction "for the sole purpose of discarding a used and no longer useful hazardous substance;" and (2) an entity is *not* liable under CERCLA "merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination." *Id.* at 610. Difficult issues of arranger liability arise, however, under "the many permutations of 'arrangements' that fall between these two extremes—cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the 'sale' of a hazardous substance are less than clear." *Id.* Because there are so many permutations, the Court recognized that whether an entity is an arranger is often a fact-specific question. *Id.* It also emphasized, though, that arranger "liability may not extend beyond the limits of the statute itself." *Id.*

Thus, the Court interpreted the term "arrange" to imply "action directed to a specific purpose" and held that "an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Id.* at 611. On the facts of *Burlington Northern*, the Court accepted

6

No. 07-40440

as true that Shell knew that its shipping conditions would result in spillage of hazardous substances. *Id.* at 612. Knowledge, standing alone, did not give rise to liability because "knowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product." *Id.*

b.

Relevant to this appeal, *Burlington Northern* effected a partial change in this Circuit's law. This Court has long recognized the so-called "useful product doctrine," and we have held that a party is not liable as an arranger if it were engaged in the mere sale of a useful product that is not properly considered to be "waste." *See Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co., W.R.*, 906 F.2d 1059, 1065–66 (5th Cir. 1990). We did not require that a party intend to dispose of waste, however, as we imposed liability as long as there was a sufficient "nexus" between the purported arranger and the disposal of waste. *See Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 929 (5th Cir. 2000). After *Burlington Northern*, we have recognized that *Geraghty & Miller* is no longer controlling authority. *Celanese Corp. v. Martin K. Eby Constr. Co.,* 620 F.3d 529, 532 n.1 (5th Cir. 2010).

On appeal, Borg Warner urges us to apply *Burlington Northern* and reverse the district court's judgment in favor of Vine Street, which was based on the outdated nexus standard from *Geraghty & Miller*. We will review this appeal under the standard in *Burlington Northern* and, in doing so, conclude that Borg Warner is not an "arranger" under CERCLA.[5]

---

[5] As a threshold matter, we conclude that Borg Warner preserved this issue for review on appeal. Generally, we must decide an appeal based on the law as it stands at the time we render our decision. *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 486 n.16 (1981). An intervening change in the law, however, "normally does not permit a party to raise an entirely new argument that could have been articulated below or in the party's opening brief." *Learmonth v. Sears, Roebuck & Co.*, 710 F.3d 249, 256 (5th Cir. 2013). In *Learmonth*, we

No. 07-40440

2.

Under *Burlington Northern*, the plaintiff must establish that the purported arranger took "intentional steps to dispose of a hazardous substance." 556 U.S. at 611. Thus, CERCLA arranger liability is premised upon an intentional act directed toward the disposal of hazardous waste.

a.

i.

We focus first on the basic intent requirement, as the district court found that the discharges of PERC were unintentional. In its opinion, the district court stated that "[w]hile the pollution happened many years ago, *neither party intended* to allow the discharge of PERC into the ground." Vine Street seizes on the phrase "into the ground" and argues that even though Norge did not intend to pollute the groundwater, it nonetheless intended for PERC to discharge into the sewer. We believe that Vine Street overemphasizes the value in this phrase, when considered in the light of the district court's opinion.

To be sure, the district court repeated and clarified its finding as to intent throughout its opinion. The district court noted that a witness "recalled no spills or *intentional disposals of PERC* that occurred and indicated College Cleaners personnel handled the rather expensive PERC with a high degree of care." It also found no evidence of a manufacturing defect or improper

---

declined to consider a new issue on appeal when the plaintiff "could have made the 'general argument' below." *Id.* at 257.

Here, Borg Warner plainly made the same general argument below that it makes today. Before the district court, Borg Warner urged the court to consider "whether the purpose of the transaction was waste disposal" under the pre-existing nexus approach. It also argued that the so-called "useful product doctrine" was relevant to deciding whether there was a disposal of waste. Additionally, we note that Vine Street also argued the case under the *Burlington Northern* standard at oral argument. Vine Street merely contends that it meets *Burlington Northern*. Thus, we proceed to evaluate the case under *Burlington Northern*.

No. 07-40440

maintenance. Each of these separate findings underscores that the district court found a lack of intent on the part of Norge and that it imposed liability solely based on the weaker nexus that existed between Norge and the ultimate disposal of PERC down College Cleaners' sewer line.

ii.

Although the district court ruled before the Supreme Court decided *Burlington Northern*, we see no need to remand the case for any further fact finding under the *Burlington Northern* standard; Norge's actions were plainly unintentional when viewed under that standard. Although the distinction between an intentional and a knowing act is a relatively fine one, *Burlington Northern* provides crucial clarification. First, the Court explained that Shell knew its shipping procedures "would result in the spilling of a portion of the hazardous substance of the purchaser or common carrier." 556 U.S. at 612. In that same vein, the plaintiffs argued that Shell could anticipate the spills and thus it was properly liable as an arranger. *Id.* Vine Street makes a similar argument in different terms today: Norge knew that PERC would escape the water separators into the sewer system, and because the discharge was inevitable, Norge necessarily intended to discharge PERC into the sewer.

The Court rejected these arguments advanced by the plaintiffs, however, underscoring two factors. First, the Court emphasized that the disposal occurred "as a peripheral result of the legitimate sale of an unused, useful product." *Id.* at 612. Critical to this appeal, the Court evaluated the underlying transaction and concluded that the purpose behind the transaction was to sell useful chemicals to distributors and not to dispose of them. Second, the Court pointed out that although Shell was aware of the spills, the spills were unintentional because "the evidence revealed that Shell took numerous steps to encourage its distributors to *reduce* the likelihood of such spills." *Id.* at 613. Thus, "[a]lthough Shell's efforts were less than wholly successful, given

these facts, Shell's mere knowledge that spills and leaks continued to occur is insufficient grounds for concluding that Shell 'arranged for' the disposal of [a hazardous substance]." *Id.*

Both factors implicated in *Burlington Northern* are also implicated here. Vine Street and Borg Warner acknowledge that PERC was a useful product that was necessary to College Cleaners' operation.[6] To the point, the district court concluded both that College Cleaners employees handled PERC with care and that Norge designed its machines to recycle as much of the PERC as possible. Here, Norge's dry cleaning machines contained water separators that would recycle most of the PERC and discharge wastewater into the sewer. Moreover, when we view the business relationship between Norge and College Cleaners as a whole, it is clear that the transaction centered around the successful operation of a dry cleaning business—not around the disposal of waste.

The First Circuit's decision in *United States v. General Electric Co.*, 670 F.3d 377 (1st Cir. 2012), provides a useful contrast. In *General Electric*, an alleged arranger had accumulated a glut of a *scrap* material, low-quality Pyranol, that it sold at bargain prices to a manufacturer that intended to use the scraps as a paint additive. *Id.* at 380. The manufacturer missed payments on the scrap material, but the arranger continued to send supplies of the scrap material. *Id.* The First Circuit concluded that the scrap Pyranol was not a useful product because there was no evidence that the arranger viewed the product as having value or marketed it as valuable. *Id.* at 386–87. The court

---

[6] Vine Street argues that Borg Warner has waived its useful product arguments because the useful product doctrine is an affirmative defense that Borg Warner failed to plead in its complaint or raise at trial. Borg Warner repeatedly raised its useful product arguments in the district court, and we may consider its arguments on appeal, particularly as they are now intertwined with the *Burlington Northern* analysis of intent.

also emphasized the suspicious facts in that case, where the manufacturer received unsolicited increases of the Pyranol and received such shipments even after regularly missing payments. *Id.* at 388. In short, the CERCLA defendant in *General Electric* attempted to dispose of excess waste products through the guise of a legitimate transaction.

Here, there is no evidence to suggest that Norge engaged in subterfuge to disguise the disposal of PERC as a legitimate transaction surrounding the operation of a dry cleaning business. Unlike *General Electric*, Norge's PERC was unused and not a scrap material, and Norge also sold College Cleaners the equipment needed to put the PERC to use. Indeed, the record reveals that College Cleaners successfully operated for some fifteen years at that location and that it used, and reused, Norge's supply of PERC.[7] Thus, as in *Burlington Northern*, the purpose of the transaction between Norge and College Cleaners was to sell PERC and dry cleaning equipment, two unused, useful products. Both Norge and College Cleaners intended that the water separators would recycle the expensive PERC for future uses.

In an analogous context, we declined to hold manufacturers of asbestos liable for environmental cleanup costs because the manufacturers designed the materials "for the primary purpose of creating a new useful and marketable product for the construction industry." *Dayton*, 906 F.2d at 1065. When those manufacturers sold the materials to the CERCLA plaintiffs, they were not "disposing" of the product. *Id.* To that end, we have said that arranger liability applies to those "who would attempt to dispose of hazardous wastes or substances under various deceptive guises in order to escape liability for their

---

[7] Indeed, Vine Street's counsel stated at oral argument that Norge's initial supply of PERC to College Cleaners constituted approximately 20% of the PERC used throughout the fifteen-year lifetime of the cleaners. This fact underscores that Norge's supply of PERC was a useful product *and* that much of the PERC was successfully recycled.

disposal." *Id.* at 1066.  Here, that description simply does not apply to Norge. We repeat that distinction: Norge supplied College Cleaners with a supply of unused, useful PERC, and some of that PERC inadvertently discharged because the water separators were not completely effective.

Furthermore, Norge developed the water separators to separate wastewater from PERC and proceeded to develop *additional* measures to reduce any discharges of PERC after it learned that the separators were not completely efficient.  The district court treated Norge's subsequent remedial measures as evidence that Norge *did arrange* for the disposal of a hazardous substance because the measures confirmed Norge's *knowledge* of the discharges.  Following *Burlington Northern*, however, it is evident to us that these remedial measures, coupled with the design of the water separators, generally *cut against* a finding of *intent*.

In sum, we hold that Norge did not intend to discharge PERC under the standard set out in *Burlington Northern*.

b.

Finally, Vine Street attempts to distinguish this case on the basis that Norge was integrally involved in installing the dry cleaning machines and connected them to the drains and sewer line.  We are unmoved by this distinction.

Vine Street's purported distinction flows in large part from dicta in a Ninth Circuit case, in which that court held that a dry cleaning equipment manufacturer was *not* liable as a CERCLA arranger but still took time to note that there was no evidence that the manufacturer "hooked up [the equipment] to the sewer." *Team Enters., LLC v. W. Inv. Real Estate Trust*, 647 F.3d 901,

12

911 (9th Cir. 2011).[8]  The *Team Enterprises* court, however, was only pointing out the complete lack of evidence in the case before it; it did so by pointing to a number of factual scenarios that might give rise to a finding of intent that were absent in the case before it.  The Ninth Circuit plainly did not hold that merely connecting dry cleaning equipment to a sewer is sufficient evidence of intent.

To be certain, the reasoning of *Team Enterprises* actually contradicts Vine Street's position here.  In *Team Enterprises*, dry cleaning equipment was designed so that the machines would deposit wastewater into a bucket.  PERC would separate from the wastewater in the bucket, and the cleaner could recycle PERC while pouring wastewater (along with invisible amounts of PERC) down the drain.  *Id.* at 906.  Much like Vine Street here, the plaintiff in *Team Enterprises* argued that "intent can be inferred from [the manufacturer's] designing its product in such a way as to render disposal inevitable."  *Id.* at 909.  Here, Vine Street argued repeatedly that intent can be inferred from the fact that discharge was "inherent" from the inefficiencies of the water separators.  The Ninth Circuit concluded, however, that "[t]he self-evident purpose of the [dry cleaning machine] was to recover and to recycle usable [PERC] that would otherwise be discarded."  *Id.*  Thus, the court held that the plaintiff had failed to show that the manufacturer *intended* to discharge PERC.  *Id.* at 909–10.

As in *Team Enterprises*, Norge designed its machines and the dry cleaning facility with the intent that College Cleaners could reuse its supply of

---

[8] Additionally, Vine Street points to a pre-*Burlington Northern* case from a California district court in which the court concluded that a CERCLA plaintiff could survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, in part because the complaint alleged that the equipment manufacturer connected the machines "to the building drain, which was itself connected to the sewer system." *Cal. Dep't of Toxic Substances Control v. Payless Cleaners*, 368 F. Supp. 2d 1069, 1080 (E.D. Cal. 2005).  As we explain *infra*, we find this district court case unpersuasive.

No. 07-40440

PERC. It did not intend to *dispose* of PERC, and thus Borg Warner is not liable as an arranger.

### B.

Finally, we turn to Vine Street's additional claim under the Texas Solid Waste Disposal Act. An entity is an arranger under the TSWDA if it:

> (3) by contract, agreement, or otherwise, arranged to process, store, or dispose of, or arranged with a transporter for transport to process, store, or dispose of, solid waste owned or possessed by the person, by any other person or entity at:
>
> > (A) the solid waste facility owned or operated by another person or entity that contains the solid waste; or
> >
> > (B) the site to which the solid waste was transported that contains the solid waste.

Tex. Health & Safety Code § 361.271(a)(3). We have held that "we are confident that the Texas Supreme Court would apply *Burlington* [*Northern*] to [a party's] SWDA claim." *Celanese Corp.*, 620 F.3d at 534. Thus, we hold that Vine Street's TSWDA fails for the same reasons as its CERCLA claim.

### III.

Consequently, Borg Warner is entitled to judgment in its favor on Vine Street's CERCLA and TSWDA claims because Norge, its subsidiary, did not intentionally dispose of a waste product when it sold dry cleaning equipment and an initial supply of PERC to College Cleaners. We should note that the Supreme Court's decision in *Burlington Northern* changed the relevant law while this case was on appeal. Accordingly, we hold that the district court's decision cannot stand in the light of *Burlington Northern*.

REVERSED, VACATED, and REMANDED, for entry of judgment in favor of Borg Warner.

14