**Ricky WYATT, by and through his aunt and legal guardian, Mrs. W.C. Rawlins, Jr., et al., Plaintiffs, Diane Martin, et al., Plaintiff–Intervenors,**

v.

**R. Emmett POUNDSTONE, III, as Commissioner of Mental Health and Mental Retardation, and the State of Alabama Mental Health Officer, et al., Defendants, United States of America, Amicus Curiae.**

Civil Action No. 3195–N.

United States District Court,
M.D. Alabama,
Northern Division.

March 22, 1996.

*Allen,* supra, differentiating negligent fault from intentional tort.

Fern Singer, Watterson & Singer, Birmingham, AL, James A. Tucker, ACLU of Alabama, Montgomery, AL, Ira A. Burnim, Andrew Bridge, Shelley Jackson, Claudia Schlosberg, Bazelon Center for Mental Health Law, Washington, DC, James M. Lichtman, Ropes & Gray, Washington, DC, Kathryn H. Sumrall, Jackson, Garrison & Sumrall, P.C., Birmingham, AL, for Ricky Wyatt, by and through his Aunt and Legal Guardian; Mrs. W.C. Rawlins, Jr.

Fern Singer, Watterson & Singer, Birmingham, AL, James A. Tucker, ACLU of Alabama, Montgomery, AL, Ira A. Burnim, Andrew Bridge, Shelley Jackson, Bazelon Center for Mental Health Law, Washington, DC, James M. Lichtman, Ropes & Gray, Washington, DC, for Glenda Brandner, by and through her husband and legal guardian Wolfgang Brandner, David S. Schoel, by and through his father and legal guardian, J. Fred Schoel, Jr., D.A.R. Peyman, Dr., for himself and all others similarly situated, Joseph L. Moudry, for himself and all others similarly situated, Brenda N. Stacey, for herself and for all others similarly situated, William Holden, Jr., for himself and all others similarly situated, Amelia B. Heath, for herself and all others similarly situated.

David Ferleger, Philadelphia, PA, Drew P. Baker, Reuben Wright Cook, Victoria Ann Farr, Alabama Disabilities Advocacy Program, Tuscaloosa, AL, for Diane Martin, Mary Beth Parker, William Smith, Adelia Keebler, Michael Guins, Richard Mills, Kim Smelley, Frankie Hopkins, Kenneth Cook, Wayne Williams.

Mary Elizabeth Culberson, Office of the Attorney General, Montgomery, AL, Gregory Dale Crosslin, Robert E. Sasser, Clifton E. Slaten, Sasser & Littleton, P.C., Montgomery, AL, G.R. (Rick) Trawick, Department of Mental Health & Mental Retardation, Montgomery, AL, Paul Smith, Genner & Block, Washington, DC, for Richard E. Hanan, as Commissioner of Mental Health and the State of Alabama Mental Health Officer, Henry Steagall, individually and in his capacity as Director of Finance for the State of Alabama, Tom Brassell, individually and in his capacity as Comptroller of the State of Alabama, Annie Laurie Gunter, individually and in her capacity as Treasurer of the State of Alabama, Ken Wallis, as Receiver of the mental illness and mental retardation operation.

Kenneth E. Vines, U.S. Attorney's Office, Montgomery, AL, Deval L. Patrick, Robinsue Frohboese, Judith C. Preston, Tawana E. Davis, United States Department of Justice, Civil Rights Division Special Litigation Section, Washington, DC, amicus.

### *ORDER*

MYRON H. THOMPSON, District Judge.

This litigation is again before the court, this time on the plaintiffs' motion to dissolve the preliminary injunction regarding the Eufaula Adolescent Center, pursuant to Rule 62(c) of the Federal Rules of Civil Procedure.[1] The court will grant the motion to the extent that it will enter an order (1) declaring that the preliminary injunction is now moot; (2) staying the injunction pending resolution of the appeal; and (3) informing the Eleventh Circuit Court of Appeals that, upon remand, the injunction would be dissolved.

### I.

The events leading up to the plaintiffs' motion to dissolve may be chronologically summarized as follows:

1. Doc. no. 1310.

*July 11, 1995:* The court issued a memorandum opinion finding that the resident children at the Eufaula Adolescent Center were not safe due to pervasive and severe safety and abuse problems. The court entered a companion order and preliminary injunction requiring the defendants to take certain interim steps to improve conditions there. Specifically, the court rejected the plaintiffs' request to close the Center and, instead, required the defendants to do the following: (1) to prepare and implement a plan to bring the facility into compliance with constitutional and *Wyatt* standards; (2) to provide for independent monitoring of implementation of the plan; and (3) to furnish copies of the order and opinion to the parents or guardians of all residents of the Center.[2] With regard to the monitoring provision, the court stated: "The monitor position need last for only one year from the day it is fully implemented.... A court's purpose in institutional litigation such as this is to remedy the violation and then to withdraw from any involvement in the affairs of the institution once it is operating in compliance with federal law. *Missouri v. Jenkins,* —— U.S. ——, ——, 115 S.Ct. 2038, 2054, 132 L.Ed.2d 63 (1995); *Freeman v. Pitts,* 503 U.S. 467, 489–90, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992)."[3] The court placed a similar one-year limit on the requirement that the defendants furnish copies of the order and opinion to the parents or guardians of all residents of the Center.[4]

*August 1, 1995:* The defendants filed a notice of appeal from the order and preliminary injunction,[5] and they requested a stay of the injunction pending appeal from this court.[6]

The defendants also submitted a proposed compliance plan for the Center.[7]

*August 8, 1995:* The court denied the stay but indicated that, pending appeal, it would continue "to reassess the need for the outstanding preliminary relief."[8] Further, the court indicated that if the monitor found conditions at the Center to be different from those described in the court's preliminary findings, this could "lead to the termination of the need for any preliminary court involvement, including even appellate review."[9] Finally, the court stated that, if, pending the appeal, the defendants "redress the problems found by the court" and the monitor finds "that some oversight [is] needed but not for a full year," the need for the preliminary injunction could cease within "a few months, at a saving to all involved."[10] "In other words, the defendants have it within their power to end the need for preliminary relief early on."[11]

*August 24, 1995:* The court rejected the defendants' proposed compliance plan and directed certain changes in it. The court further modified the requirements for the plan to include "a one-year sunset provision" "to ensure that the court's intervention in the State's operation of the Center is reasonably limited to meeting the resident safety objectives described in the July 11 memorandum opinion."[12] With this modification, all of the essential requirements of the preliminary injunction would terminate in one year.

*September 15, 1995:* The court approved the defendants' resubmitted proposed compliance plan and ordered the defendants to implement it for a period of no more than one year. In the same order, the court appointed the defendants' nominee, Dr. Richard Thigpen, to be the monitor of the Center for a period of no more than one year.[13]

2. *Wyatt v. Poundstone,* 892 F.Supp. 1410 (M.D.Ala.1995).

3. *Id.* at 1422.

4. *Id.* at 1423.

5. Doc. no. 1141.

6. Doc. no. 1139.

7. Doc. no. 1143.

8. Order of August 8, 1995 (Doc. no. 1150), at 7.

9. *Id.* at 8.

10. *Id.* at 8 n. 17.

11. *Id.*

12. Order of August 24, 1995 (Doc. no. 1178), at 5.

13. Order of September 15, 1995 (Doc. no. 1216).

*August 1995:* Pursuant to an agreement between the parties, the defendants ceased admitting new patients to the Center.[14] According to the reports of the monitor filed with the court, the number of children at the Center has steadily declined since then.[15]

*October 20, 1995:* The monitor reported that Associate Commissioner Fetner had advised that, "after much study, a recommendation was being made to move towards *closing* the Eufaula Adolescent Center, with a possible timetable centering around the beginning of 1996."[16] "It was indicated," according to the monitor, "that such a policy recommendation would be accompanied by proposed, alternative approaches to the mission and needs fulfilled at Eufaula, including possible reliance on the multi-needs approach to adolescent children's needs, as prescribed by legislation in Alabama."[17]

*October 31, 1995:* In response to the monitor's report, the plaintiffs filed a letter with the court noting concerns about the defendants' plans regarding continued operation of the Center.[18]

*November 14, 1995:* The defendants responded to the plaintiffs' concerns regarding the Center's closing, stating that "Defendants have not finalized any plans to *close* [the Center]."[19]

*March 1, 1995:* The monitor reported that "a recommendation to *close* [the Center] is still pending in the Department of Mental Health and Mental Retardation.... [I]f current treatment plan projections are met, all current residents would be discharged by a date sometime in April." The monitor indicated that various proposals for the Center had been suggested, including "acquisition of the Center by the Department of Youth Services." The monitor also indicated that, "should admissions be reopened, indications are that operations would be continued on a scaled-down basis, perhaps with a census as low as 25 children."[20]

*March 4, 1996:* Associate Commissioner Fetner notified the monitor that approval had been received respecting the recommendation to *close* the Eufaula Adolescent Center, and that the date for *closing* was April 15, 1996.[21]

*March 6, 1996:* The monitor reported that Mr. Dykes, the Center's director, confirmed that "the *closing* was to be *complete* and *final* on April 15."[22]

*March 7, 1996:* The defendants notified the monitor that the actions taken with regard to the Center constitute a "suspension of operations, effective mid-April." The monitor attempted to ascertain "whether the Center is being *closed,* as reported by me in the Report, or whether operations are being *suspended.*" Defense counsel called the monitor back and "stated that information in this report, which [the monitor] read to him by phone, was correct but, from the Department's standpoint, this places the Center in the status of 'suspended operations.'"[23]

On the same date, the defendants filed with the court "A Notice of Suspension of Operations of the Eufaula Adolescent Center."[24] According to a Department of Mental Health and Mental Retardation news release attached to the notice, the suspension was "at least in part due to a recommendation made by a committee appointed by

---

14. Transcript of March 14, 1996, status conference, at 10.

15. Report of the monitor, filed on December 1, 1995 (Doc. no. 1275) (25 children); Report of January 2, 1996 (Doc. no. 1283) (18 children); Report of January 23, 1996 (Doc. no. 1287) (14 children); Report of February 6, 1996 (Doc. no. 1293) (13 children); Report of March 1, 1996 (Doc. no. 1298) (10 children).

16. Report of the monitor, filed November 13, 1996 (Doc. no. 1268), at 10 (emphasis added).

17. *Id.*

18. Doc. no. 1258.

19. Doc. no. 1269 (emphasis added).

20. Report of the monitor, filed March 1, 1996 (Doc. no. 1298), at 3 (emphasis added).

21. Report of the monitor, filed March 7, 1996 (Doc. no. 1301), at 1 (emphasis added).

22. *Id.* (emphasis added).

23. Letter from the monitor, filed March 7, 1996 (Doc. no. 1302) (emphasis added).

24. Doc. no. 1300.

[Commissioner] Poundstone to review operations at all state-operated mental illness facilities in terms of long-term appropriateness for customer service, overall effectiveness and cost-efficiency." [25] The Department also noted that the cost of maintaining accreditation was a factor in the decision. "Furthermore, for the facility to continue to meet accreditation standards, the state would have to replace the residential dormitory at a cost of approximately $5 million. The [Department] has been working with state and local officials to develop appropriate alternatives for adolescent mental health treatment and to explore the state's options in terms of the physical facility itself." [26]

The Department indicated that it had made provisions to transfer the Center's 138 employees. "The vast majority of these employees will be offered an opportunity to transfer to positions at other [Department] facilities. In addition, the [D]epartment will work with the state Personnel Department, the Alabama State Employees' Association and others to identify vacant positions within other state agencies, and in community programs." [27]

In the same news release, the Department also indicated, for the first time as far as the court is aware, that the court's preliminary injunction was a factor in the Center's closing or suspension of operations. "In addition," according to the Department, "the preliminary injunction issued by the [court] in *Wyatt*, and the delays associated with the appeals, directly contributed to the decision to suspend operations." [28]

*March 14, 1996:* At a status conference held in chambers, defense counsel represented to the court that operations at the Center have been suspended and that no more children are residing there.[29] In response to the court's question as to whether the suspension was due to the plaintiffs' prior request to close the Center, made as a part of their motion for preliminary injunction, defense counsel stated that "This is not a recognition ... of any acquiescence to the plaintiffs' request; this is based upon a *funding shortfall.*" [30] Defense counsel also acknowledged, with regard to the monitor, that they were "not arguing that we need one" pending appeal.[31] In response to the court's "bottom-line" question, "Why do we need the injunction?", defense counsel gave no reason other than "I believe the injunction, just as a matter of law, is in effect because it's pending before the Eleventh Circuit Court of Appeals." [32] Counsel for the plaintiffs stated that "There is no need for ... the monitor or for the Abuse Protection Committee. And no need for the injunction which at the moment has no practical effect."[33]

Defense counsel further indicated that, even if they prevailed on appeal, they could not "answer substantively" whether they expected to resume operations at the Center. Defense counsel described the reopening of the Center as only an "option." [34]

From the above events, the following is apparent: (1) the safety and abuse problems identified in prior orders no longer exist at the Center because there are no longer any children residing there; (2) in view of the lack of funding and the relocation of staff, the Center is unlikely to resume operations by September 1996, that is, within the one-year period in which the injunction is legally enforceable; (3) in view of the recommendation by the Commissioner's committee that the Center be "closed," and the confirmation by the Center's director that "the *closing* was to be *complete* and *final,*" it is unlikely that the Center will reopen at all; and (4) in view of the other options being explored by the de-

---

25. Notice of suspension of operations, filed March 7, 1996 (Doc. no. 1300), Exhibit A at 1.

26. *Id.* at 2.

27. *Id.*

28. *Id.* at 1.

29. Transcript of March 14, 1996, status conference at 8–9.

30. *Id.* at 10 (emphasis added).

31. *Id.* at 11.

32. *Id.* at 12.

33. *Id.* at 13.

34. *Id.* at 9, 10.

fendants and the monitor's assessment of them, it is unlikely that, even if the Center were to reopen, it would resume operations under conditions substantially similar to those in existence at the time the injunction was imposed—indeed, none of the options mentioned by the monitor in his reports includes reopening the Center on a scale and in a form similar to that at the time of the preliminary injunction.

## II.

### A.

The plaintiffs now move for the court to dissolve the preliminary injunction since it is no longer needed in order to protect the Center's resident children. "A case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Pacific Insurance Co. v. General Development Corp.,* 28 F.3d 1093, 1096 (11th Cir.1994). The controversy over the injunction at the Center no longer exists. Neither the plaintiffs nor the defendants have offered, and this court cannot fathom, any reason why the terms of the injunction should—or could—remain in effect where the purpose of the injunction was to protect the Center's children and there are now no children subject to the injunction's protection. *See, e.g., Darring v. Kincheloe,* 783 F.2d 874 (9th Cir.1986) (prisoner's claim for injunction to improve prison conditions is moot if prisoner is no longer subject to those conditions); *Martin v. Sargent,* 780 F.2d 1334 (8th Cir.1985) (same).

The defendants contend that "there is clearly a continuing dispute over the legality of conditions and care" at the Center because the Center may reopen; thus, they argue, the controversy is not moot.[35] The court rejects this contention for several reasons. First, as the court has found, the Center is not likely to reopen. The monitor found that it had closed, and the recommendation of the Commissioner's committee was that it be closed. Second, the fact that the reopening of the Center remains, as defense counsel

described it, an "option," along with turning the facility over to the Department of Youth Services, opening it as a larger facility, or opening it as a smaller facility, is not sufficient to keep the controversy alive for purposes of the appeal. "Options" are mere abstract propositions. It has long been settled that "a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Brooks v. Georgia State Bd. of Elections,* 59 F.3d 1114, 1118 (11th Cir.1995) (quoting *Church of Scientology of California v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992)).

Third, even *if* the Center reopened, it might do so in a very different form. The preliminary injunction imposed by the court would hardly be applicable to a small, 25–bed facility. The injunction was carefully tailored to the Center's institutional characteristics, and its provisions would not readily be transferable to a different institutional structure. The fact that the physical facility might be used in the future, even by the Department of Mental Health and Mental Retardation, does not mean that the same controversy that gave rise to the need for the preliminary injunction would exist.

Fourth, although there is an exception to the mootness doctrine for those controversies that are "capable of repetition, yet evading review," *see, e.g., Brooks,* 59 F.3d at 1120, it is not applicable here. This doctrine applies only in exceptional situations, *see City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983), and only where there is a "reasonable expectation or demonstrated probability that the same controversy will recur involving the same complaining party." *Brooks,* 59 F.3d at 1120. There must be more than a "mere physical or theoretical possibility of recurrence." *Id.* (quoting *C & C Products, Inc. v. Messick,* 700 F.2d 635, 637 (11th Cir.1983)). Although the defendants insist that they maintain the *option* to reopen the Center, all

---

**35.** Defendants' memorandum in opposition to plaintiffs' motion to dissolve, filed March 20, 1996 (Doc. no. 1315), at 8.

other evidence before the court points to the fact that this is an unlikely prospect, at least within the one-year term of the preliminary injunction.

In addition, to avail themselves of the "evading review" exception, the defendants would have to show that the challenged action was of too short duration to be fully litigated. *See Brooks*, 59 F.3d at 1120. The defendants cannot make such a showing where the trial court still has the opportunity to address the merits of the case and the parties still have an opportunity to appeal at a later point. *Id.* at 1121; *Tropicana Products Sales, Inc. v. Phillips Brokerage Co.*, 874 F.2d 1581, 1583 (11th Cir.1989). The injunction here is only preliminary; the court has yet to rule on the merits of the case and, if necessary, to fashion final relief. When the court does rule on the merits of the case, the parties will certainly have the opportunity to appeal the court's decision. Therefore, it cannot be shown that the current controversy "evades review."

The injunction is moot on other grounds as well. The injunction and all of the accompanying orders and opinions contemplate that the injunction would terminate as soon as its objectives have been met, that is, when children are no longer subject to safety and abuse problems at the Center. The objectives of the injunction have been met, and the injunction on its terms is no longer effective. *See Pacific Insurance Co. v. General Development Corp.*, 28 F.3d 1093, 1097 (11th Cir. 1994) (stating that an appeal of an injunction that has been terminated by its terms is moot); *Tropicana Product Sales*, 874 F.2d at 1581.

**B.**

Before the court can dissolve the moot injunction, it must first consider whether it maintains jurisdiction to do so while the injunction is on appeal to the Eleventh Circuit. "As a general rule, '[t]he filing of a notice of appeal ... divests the district court of control over those aspects of the case involved in the appeal.'" *Pacific Insurance Co.*, 28 F.3d at 1097 n. 7 (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 402, 74 L.Ed.2d 225 (1982)). However, Rule 62(c) creates an exception to the general rule, permitting a district court, in its discretion, "to suspend, modify, restore or grant an injunction during the pendency of the appeal." Fed.R.Civ.P. 62(c).

The plaintiffs argue that dissolution is the appropriate step under Rule 62(c) where, as here, an injunction is no longer needed to preserve the rights of the party whom it was entered to protect. Rule 62(c) does not explicitly provide for dissolution of an injunction pending appeal, however, and the case-law on dissolution under Rule 62(c) is not altogether transparent. Recently, in *Pacific Insurance Co.*, the Eleventh Circuit Court of Appeals reserved reaching the issue of whether a district court had jurisdiction to vacate an appealed injunction as moot under Rule 62(c). 28 F.3d at 1097 n. 7. The Fifth Circuit Court of Appeals, on the other hand, clearly stated in *Coastal Corp. v. Texas Eastern Corp.*, 869 F.2d 817 (5th Cir.1989), that Rule 62(c) does not confer jurisdiction on the district court to dissolve an injunction that is on appeal. *Id.* at 820. Noting "an imposing thicket of jurisdictional thorns" surrounding this issue, the appellate court held that dissolution is not within a district court's jurisdiction, in part because Rule 62(c)'s drafters must have intended to omit "dissolve" from the list of powers conferred upon courts. *Id.* at 819. In any event, the question of whether this court has the power to dissolve the preliminary injunction while it is on appeal is a close one. It is clear, however, that Rule 62(c) permits the court to *stay* the now-ineffective injunction until the Court of Appeals has had the opportunity itself to consider whether the appeal is moot. Rule 62(c) explicitly allows a court to "suspend" an injunction pending appeal. This presumes that a court may terminate operation of an injunction after it has already been put into effect if circumstances require it. Here, equity—and common sense—requires the court to allow the Center to return to the status quo ante. Neither the plaintiffs nor the defendants want the injunction. The plaintiffs have acknowledged that the injunction is no longer needed and have requested that the injunction be dissolved, and the defendants

previously requested a stay. The court simply has no one before it who wants the injunction—at least pending appeal.

Presented with these facts, the court believes that the best course to follow is to enter a stay order, accompanied by a declaration of mootness and a statement to the appellate court that, upon remand, the injunction will be dissolved. In this way the court will acknowledge that the need for the injunction is moot, it will meet its obligation to "withdraw from involvement in the affairs of the institution" once the need is no longer there,[36] and it will avoid the difficult issue of whether a trial court has jurisdiction to dissolve a preliminary injunction pending appeal.

## C.

■ Although it appears that neither the plaintiffs nor the defendants want the injunction to continue—at least pending appeal—the court believes that, in light of the unsettled nature of the law in this circuit, it is prudent to go ahead and apply the traditional factors considered by courts when confronted with a request for a stay. Generally, in determining whether to grant a stay pending appeal, courts must examine the following factors: (1) whether the applicants have made a strong showing that they are likely to prevail on appeal; (2) whether the applicants will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724; *United States v. Bogle,* 855 F.2d 707, 708 (11th Cir. 1988). Due to the unusual posture of this case, where the party that originally sought the injunction now requests its termination, these factors cannot be rigidly applied. Nonetheless, the court will apply the *Hilton* principles to this case to determine whether the stay can be granted.

■ As to the first factor, the court will consider the likely outcome of the appeal of the preliminary injunction. The injunction is not likely to be sustained on appeal regardless of which party prevails. The plaintiffs have made a strong showing that the Eleventh Circuit will dismiss the appeal for mootness. First, as discussed supra II.A., the injunction on its terms contemplates that it may be terminated when its objectives have been met, and this may be grounds for finding the appeal moot, *see Pacific Insurance Co.,* 28 F.3d. at 1097. Second, "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party," the appeal is moot. *Brooks,* 59 F.3d. at 1118 (quoting *Church of Scientology of California,* 506 U.S. at 12, 113 S.Ct. at 449 (1992)). Since there are no more children at the Center, and the plaintiffs and the defendants agree that the injunction has no purpose, it is clear that the Court of Appeals could not grant "any effectual relief whatever" to the prevailing party. Moreover, even if the defendants prevail, and the appeal is not found to be moot, the injunction will not remain in its current form. The first factor weighs very heavily toward staying the injunction.

The second and third factors also weigh toward staying the injunction. Imposing a stay is in the interests of the plaintiffs and the defendants. In this context, the continued operation of the injunction would impose harm on the defendants, who bear the considerable costs of monitoring and maintaining an empty facility. No party will be harmed by the stay.

Lastly, but perhaps most significantly, the public interest clearly lies in granting the stay of the preliminary injunction. Continued oversight of the Center and the costs associated with such oversight would be a wasteful use of limited public funds. The court's purpose in institutional litigation such as this is to remedy the violation and then to withdraw any involvement in the affairs of the institution. Now that there are no children residing at the Eufaula Adolescent Center, the court has no role to play there.

Accordingly, for the above reasons, it is ORDERED that the plaintiffs' motion to dissolve this court's preliminary injunction re-

---

**36.** *Wyatt,* 892 F.Supp. at 1422.

garding the Eufaula Adolescent Center, filed March 15, 1996 (Doc. no. 1310), is granted to the following extent:

(1) It is DECLARED that the need for the preliminary injunction entered on July 11, 1995 (Doc. no. 1120), is moot.

(2) The preliminary injunction is stayed.

(3) The appellate court is informed that, upon remand, this court will dissolve the preliminary injunction.

It is further ORDERED, for the above reasons, that the defendants' motion to dismiss, filed March 20, 1996 (Doc. no. 1316), is denied.